FILED
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

**October 4, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

FRANCISCO SANCHEZ,

    Plaintiff - Appellant,

v.

CORIZON HEALTH, INC.,

    Defendant - Appellee.

No. 21-8069
(D.C. No. 2:20-CV-00109-ABJ)
(D. Wyo.)

_____

### ORDER AND JUDGMENT*
_____

Before **HOLMES**, Chief Judge, **KELLY** and **HARTZ**, Circuit Judges.
_____

Francisco Sanchez appeals the district court's order granting summary judgment in favor of Corizon Health, Inc. (Corizon), on his claims for deliberate indifference to his serious medical needs under 42 U.S.C. § 1983 and medical malpractice under Wyoming law.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm; however, we remand to the district court with instructions to modify its dismissal of the deliberate-indifference claims to be without prejudice.

---

* After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.  BACKGROUND

Mr. Sanchez, a Wyoming state prisoner, is incarcerated in the Wyoming State Penitentiary (WSP).  Corizon has a professional services contract with the Wyoming Department of Corrections (WDOC) to provide medical services to inmates who are incarcerated in its facilities.

Beginning in 2008, Mr. Sanchez complained that his medications (proton pump inhibitors) were not effectively controlling his heartburn.  Corizon referred him to a general surgeon for an endoscopy.  Based on a visual examination, the surgeon diagnosed him with gastroesophageal reflux disease (GERD), mild gastritis, and "[p]robable Barrett's esophagitis."  Aplee. Suppl. App. at 56.  The pathology report, however, did not support a diagnosis of Barrett's esophagus;[1] instead, the biopsy was "without diagnostic abnormality."  *Id.* at 57 (capitalization omitted).  The parties agree that a diagnosis of Barrett's esophagus cannot be made by a visual examination; rather, a proper diagnosis requires confirmation of cellular changes by pathology.

When Mr. Sanchez continued to complain of heartburn, Corizon sent him to the same surgeon for a second endoscopy in 2010.  Once again, however, the

---

[1] Barrett's esophagus, also known as Barrett syndrome, is a change in the esophageal tissue acquired as the result of long-standing reflux of gastric acid. Esophageal stricture (narrowing) and an increased risk of cancer have been associated with the condition.  *See* Stedman's Medical Dictionary 877090 (West 2014).

pathology did not reveal any cellular abnormalities and reconfirmed that he did not have Barrett's esophagus.

In December 2013, Mr. Sanchez was seen by Corizon employee Susanne Levene, M.D., a board-certified surgeon. He told Dr. Levene that he was having difficulty swallowing and had been diagnosed with Barrett's esophagus. She noted that the surgeon who performed the two previous endoscopies had seen Mr. Sanchez in July and scheduled another endoscopy; however, for some unknown reason, it "was never done." Aplt. App., Vol. II at 124. "In light [of his complaints of] dysphagia," Dr. Levene recommended another endoscopy. *Id.*

But the endoscopy recommended by Dr. Levene was not performed; instead, she met with Mr. Sanchez in December 2014, and told him that she had reviewed the pathology report from the 2010 endoscopy and "reassured [him] that he does NOT have Barrett's." Aplee. Suppl. App. at 62. According to Dr. Levene, "because there was no evidence of Barrett's esophagus in either of his pathology results from 2008 or 2010, it was not necessary to conduct an additional monitoring endoscopy." *Id.* at 106. She also advised Mr. Sanchez that medical would no longer write him prescriptions for Zantac and Prilosec—meaning these over-the-counter medications would no longer be free—and he needed to purchase them at the commissary.

In early January 2015, Mr. Sanchez complained of "[h]eartburn all day." Aplt. App., Vol. II at 130. He was advised to buy "[P]rilosec or [Z]antac" at the commissary. *Id.* In February, he reported that his "bland diet ran out" and he wanted "it renewed as soon as possible." Aplee. Suppl. App. at 93. A nurse responded

3

promptly and told him that "[a] bland diet is no longer being offered per WDOC dietary and nutritional services—all inmates receive a 'healthy heart' tray from which they have selections for you to create a 'bland' food meal." *Id.* She also advised him to "[b]e sure to check the weekly menu posted in your POD—it will help you decide which meals will be particularly easy to make the right 'picks' & the ones you may want to supplement with your own snacks." *Id.*

Dissatisfied with the response, Mr. Sanchez renewed his inquiry about a bland diet. The nurse acknowledged that although he "suffer[s] from acid-reflux symptoms, . . . there is no proven disease process that allows us to assign any special diet or snacks. You were [discharged] from the GERD chronic care clinic for that same reason." *Id.* at 94. But she did let Mr. Sanchez know that he would "be referred to the dietician who visits once monthly . . . [W]e're not sure . . . when she will be here in March, but . . . appreciate your patience[.] [In the meantime], work on good choices, and write down any questions you might have for [the dietician]." *Id.* Just a few days later, he reported that his "acid reflux is bad. Meds. don't work & I am losing calories by not eating more than half the main courses of most meals." Aplt. App., Vol. II at 132. He renewed his complaints about acid reflux in August, September, and October 2015.

In April 2016, Mr. Sanchez complained of groin pain and was placed on a thirty-day gym restriction. A few days later, he complained about "[r]ight side and testicle burning." *Id.* at 144. He was advised to continue icing the affected area, take "ibu/tylenol . . . for pain," and stop lifting weights during the remainder of the gym

4

restriction. *Id.* at 145. When his pain did not improve, he was examined by Corizon employee, Robert White, M.D., an internist, who detected a "small 1cm direct hernia on the right side that is easily reducible." *Id.* at 149. He explained to Mr. Sanchez how to check for a hernia and the need to remain on gym restrictions until it healed. Dr. White also prescribed a hernia belt.

Mr. Sanchez next complained about the hernia four months later in September 2016, when he reported that "the vein on [his] penis . . . [was] swollen" and the pain was interfering with his sleep. *Id.* at 151. Dr. White performed another examination and noted that the hernia "is not as recognizable on physical exam as it was last time. . . . [N]o medical treatment [needed] at this time [because the] hernia is reducible." *Id.* at 154. Dr. White also discussed with Mr. Sanchez "hernia repairs and successes, reality vs. expectation of surgery and outcomes." *Id.*

In January 2018, Mr. Sanchez was transferred from the WSP to the Wyoming Medium Correctional Institution (WMCI). As part of the intake process, a nurse reviewed his chart and noted the "diagnosis of GERD." *Id.* at 156. But the nurse also noted that a review of his "commissary list . . . for the past 90 days . . . shows multiple purchases of common trigger foods for acid reflux including caffeine, spicy foods, chocolate." *Id.* The nurse discussed her findings with a doctor, who agreed there was "no indication for . . . visits [to the chronic care clinic] or [a] prescription acid reducer." *Id.*

On April 18, 2018, Mr. Sanchez was seen at the WMCI medical clinic for his hernia. He reported that the "size seems to be the same[,] but pain has increased

5

[compared to] 2 months ago" due to increased activity. *Id.* at 157. On examination, the nurse noted that in the "right inguinal canal there is a small 1-2cm bulge palpated in standing position only when bearing down, self reduces when abdominal pressure is released." *Id.* She reported "no intervention is needed at this time[.] [S]eems to be similar in shape/size as prior exam by Dr. White." *Id.*

In January 2020, Mr. Sanchez was transferred from the WMCI to a facility in Mississippi. On intake, he reported suffering from heartburn but did not mention any other complaints, including a hernia. Nor did he report any problem with the hernia when he was seen at the Mississippi facility's medical clinic in April for an unrelated event. Similarly, Mr. Sanchez did not report a hernia or request any treatment during his intake examination when he was transferred back to the WSP in June. Nonetheless, shortly after he was transferred back to the WSP, he filed suit against Corizon for its alleged deliberate indifference to his serious medical needs and medical malpractice related to his GERD, Barrett's esophagus, and hernia.

In February 2021, while his suit was pending, Mr. Sanchez submitted a health service request in which he advised the medical staff that he had retained an expert witness in his suit against Corizon. According to Mr. Sanchez, his expert, G. Douglas Schmitz, M.D., a general surgeon, "has reviewed my medical records . . . and recommended an interval UGI endoscopy with evaluation of the gastroesophageal junction and biopsy to . . . [rule out] Barrett's esophagus, and to evaluate the presence or absence of a diaphragmatic hernia or hiatal hernia." Aplee. Suppl. App. at 143 (internal quotation marks omitted). He further stated that

6

Dr. Schmitz would opine that "the standard of care for a symptomatic hernia is . . . hernia [surgery] on an outpatient basis." *Id.* To that end, he asked Corizon to schedule an appointment with Dr. Schmitz "for both my Barrett's Esophagus and my hernia. I need the endoscopy and biopsy, and I need to be evaluated for a potential hernia repair." *Id.*

Shortly thereafter, Dr. Levene met with Mr. Sanchez about his request. He told Dr. Levene that he had a hernia on his right side, but admitted that he "has not seen a bulge[;] [rather,] he feels a burning in the right groin when he participates in strenuous activity." Aplt. App., Vol. II at 142. Dr. Levene examined his "[i]nguinal area . . . and [determined that he] does not have a left or right sided hernia." *Id.* She acknowledged that Dr. White and a nurse practitioner "may have believed [he] had an inguinal hernia in the past; however, as a board-certified general surgeon, [she believed that she was] better qualified to assess the existence of an inguinal hernia and the need for surgical repair." Aplee. Suppl. App. at 107.

During the examination Mr. Sanchez also reported heartburn. Dr. Levene diagnosed him with "[e]pigastric pain," and prescribed "[two] months of high dose . . . omeprazole . . . along with sucralfate." Aplt. App., Vol. II at 142. She further said that he should "be given a bland diet . . . [and] [i]f his symptoms persist . . . [she] may consider [an endoscopy], [although he] currently . . . does not have dysphagia or evidence of stricture clinically." *Id.*

When Dr. Levene saw Mr. Sanchez in May, he reported that "the omeprazole has been helping, as has the sucralfate." Aplee. Suppl. App. at 145. She also found "[n]o evidence on repeat exam of right inguinal hernia." *Id.*

In July 2021, Corizon referred Mr. Sanchez to John C. Lumb, M.D., a general surgeon. Dr. Lumb examined Mr. Sanchez, and like Dr. Levene, he found no hernia. Dr. Lumb also performed an endoscopy. There were no cellular abnormalities indicated in the pathology report, which again confirmed that Mr. Sanchez does not have Barrett's esophagus.

As to his expert opinion, and the alleged hernia, Dr. Schmitz agreed that if he examined a patient and could not feel or see a bulge, he would not recommend hernia surgery. *Id.* at 54. He also admitted that he never examined Mr. Sanchez. As to GERD and the need for a third endoscopy, he opined that "[p]atients with persistent GERD who do not respond to medical therapy consisting of lifestyle changes, weight loss, avoidance of certain foods and antacid medications including proton pump inhibitors will generally be recommended for interval [upper] endoscopy with evaluation of the gastroesophageal junction and biopsy to [rule out] Barrett's esophagus." Aplt. App., Vol. II at 95. Importantly, he said that he would ignore conservative medical treatments such as diet and medications and "jump" to an endoscopy *only* if the patient was having "alarm symptoms"; however, he conceded that Mr. Sanchez had no alarm symptoms. *Id.* at 100. Nonetheless, Dr. Schmitz opined that "[t]he care providers at the [WSP] have breached the standard of care by

8

not appropriately evaluating Mr. Sanchez for his symptoms of GERD and possible

Barrett's esophagus," by failing to perform a third endoscopy. *Id.* at 96.

## II.  DISTRICT COURT PROCEEDINGS

In his complaint, Mr. Sanchez alleged that Corizon was deliberately indifferent

to his serious medical needs when it failed to properly treat his GERD, Barrett's

esophagus, and hernia, including its failure to provide a bland diet and free

medications.  He also alleged that Corizon committed medical malpractice when it

failed to provide him the option of surgery to repair his hernia and to perform a third

endoscopy.

The district court granted Corizon's motion for summary judgment and

dismissed the claims with prejudice.  The court found that summary judgment was

proper on the deliberate-indifference claims because Mr. Sanchez failed to exhaust

his administrative remedies.  Further, the court found that summary judgment was

proper on the medical malpractice claims because Mr. Sanchez failed to present

expert witness testimony to establish a prima facie case under Wyoming law.  Mr.

Sanchez appeals.

## III.  STANDARD OF REVIEW

"We . . . review de novo the [district court's] finding that [a plaintiff] failed to

exhaust his administrative remedies." *May v. Segovia*, 929 F.3d 1223, 1234

(10th Cir. 2019) (internal quotation marks omitted).  We also review a district court's

grant of summary judgment de novo. *Callahan v. Poppell*, 471 F.3d 1155, 1158

(10th Cir. 2006).  Summary judgment is appropriate "if the movant shows that there

9

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e look at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

"Once the moving party has identified a lack of a genuine issue of material fact, the nonmoving party has the burden to cite to specific facts showing that there is a genuine issue for trial." *May*, 929 F.3d at 1234 (internal quotation marks omitted). "Those specific facts must be supported by particular parts of materials in the record; relying on mere pleadings is insufficient." *Id.* (citation and internal quotation marks omitted). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Self*, 439 F.3d at 1230 (internal quotation marks omitted).

## IV. DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

### A. *Exhaustion Requirement*

Under the Prison Litigation Reform Act (PLRA), a prisoner cannot bring an action "with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Jones v. Bock*, 549 U.S. 199, 211 (2007) ("[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court."). Generally, "courts should . . . dismiss . . . unexhausted claims without prejudice." *Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1113 (10th Cir. 2007).

"Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following *all* of the steps laid

out in the prison system's grievance procedure." *Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) (citation omitted) (emphasis added). "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim." *Id.* (internal quotation marks omitted).

When a defendant has established that an inmate did not exhaust his or her administrative remedies, the burden then shifts to the plaintiff to establish the grievance process was unavailable. *May*, 929 F.3d at 1234. In *Ross v. Blake*, 578 U.S. 632, 643-44 (2016), the Supreme Court identified "three kinds of unavailability": (1) when a procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

## B. *WDOC Grievance Procedure*

Under WDOC Policy No. 3.100, "[i]f an inmate is unable to informally resolve an issue at the institutional level . . . by speaking with appropriate staff . . . an inmate may seek resolution of the issue by submitting a written grievance" to the grievance manager. Aplee. Suppl. App. at 167. The written grievance shall "include a simple and straightforward summary of the incident or occurrence giving rise to the grievance or reason for the grievance and a requested grievance resolution or remedy." *Id.* at 168. If the appeal is not resolved to the inmate's satisfaction, he is

11

required to file a first appeal with the facility warden. If the inmate remains dissatisfied, he must file a second appeal with the director of the WDOC.

## C. *Analysis*

Mr. Sanchez did not exhaust his administrative remedies with respect to any of his deliberate-indifference claims. First, with respect to the denial of his requests for a bland diet and to receive free medication, he admitted that he only took the claims "to the level of the warden." Aplt. App., Vol. III at 24. Next, concerning Corizon's failure to provide a third endoscopy, he conceded that the only "grievance" he filed was "just the request in the [health services request]." *Id.* at 23. Last, when asked if he filed any grievances about the hernia, he responded "No, ma'am." *Id.* at 24.

Having failed to establish that he exhausted his administrative remedies, the burden shifted to Mr. Sanchez to establish the grievance process was unavailable. In this regard, he argues that the WDOC's grievance process is "futile for [him] and every other inmate in the Wyoming DOC system [because] there isn't a single medical decision Corizon makes that the DOC doesn't rubber-stamp." Aplt. Opening Br. at 28 (internal quotation marks omitted). However, summary judgment was proper because this conclusory assertion is insufficient to establish that WDOC's grievance system is a dead end. There is no evidence in the record regarding other aggrieved inmates or that the WDOC failed to investigate and respond to the grievances filed by Mr. Sanchez. His disagreement with the outcome does not mean that the process was a dead end.

12

Thus, we agree with the district court that Mr. Sanchez failed to exhaust his administrative remedies.

## V.  MEDICAL MALPRACTICE

### A.  *Legal Framework*

To establish a prima facie claim for medical malpractice under Wyoming law, the plaintiff has the burden of showing "(1) the accepted standard of medical care or practice, (2) that the doctor's [or provider's] conduct departed from the standard, and (3) that his conduct was the legal cause of the injuries suffered." *Oakden v. Roland*, 988 P.2d 1057, 1059 (Wyo. 1999) (internal quotation marks omitted).  "It is well settled that in all but the extraordinary medical malpractice case, the plaintiff has the burden of producing expert testimony to support a prima facie case of negligence." *Harris v. Grizzle*, 625 P.2d 747, 752 (Wyo. 1981).  An exception to the general rule "that a standard of care must be provided by expert medical testimony arises where [the] asserted negligence consists of conduct so obviously wanting in reasonable medical skill and prudence that it may be so adjudged even by laymen." *Stundon v. Stadnik*, 469 P.2d 16, 22 (Wyo. 1970).

### B.  *Analysis*

#### i.  *Bland Diet and Free Medication*

Mr. Sanchez's retained expert, Dr. Schmitz, stated that he would not offer an opinion that Corizon breached the standard of care for treatment of GERD by failing

to provide a bland diet or prescribe over-the-counter medications.[2]  In light of this concession, the district court found that "[b]ecause [Mr. Sanchez's] case does not fall within the exception to the rule requiring expert testimony and no . . . expert testimony supports [his] diet and free medication claims, summary judgment on those claims is appropriate."  Aplt. App., Vol. III at 157-58.

Now, for the first time on appeal, Mr. Sanchez argues that it does not matter that Dr. Schmitz did not offer testimony on the standard of care regarding a bland diet because the standards for health services promulgated by the National Commission on Correctional Health Care (NCCHC) satisfy Wyoming's requirement for expert medical testimony on the standard of care.[3]  We have carefully reviewed the record and cannot find where this argument was presented to the district court. To be sure, Mr. Sanchez attached a copy of the NCCHC standards to his response to Corizon's motion for summary judgment; however, he never argued that the NCCHC standards satisfy the requirement for expert medical testimony on the standard of care.[4]  Indeed, the only references to the standard of care in Mr. Sanchez's response

---

[2]  There is no evidence that the over-the-counter medications recommended by Corizon to treat his GERD were not available at the commissary or that he was otherwise prevented from securing them; instead, Mr. Sanchez wanted a prescription for his medications because medications that are prescribed, including over-the-counter medications, are provided to an inmate at no cost.

[3] Mr. Sanchez points to no evidence, expert or otherwise, that the standard of care required Corizon to write him a prescription for over-the-counter medications.

[4] We also note that in actions alleging negligence by a health care provider, "[i]f the defendant is certified by a national certificating board or association," the plaintiff has the burden of proving that

14

concerned Dr. Schmitz's opinion that "[t]he standard of care for patients with persistent [GERD] who do not respond to medical therapy is interval UGI endoscopy with evaluation of the gastroesophageal junction and biopsy to rule out Barrett's esophagus and to evaluate the presence or absence of a diaphragmatic hernia or hiatal hernia." *Id.*, Vol. II at 6. *See also id.* at 15 ("The standard of care for [Mr. Sanchez's] GERD/Barrett's condition required a repeat endoscopy every three or so years."); *id.* at 23 ("[Dr. Schmitz] sums up the malpractice quite succinctly. . . . Says Dr. Schmitz, 'The care providers at the Penitentiary have breached the standard of care by not appropriately evaluating Mr. Sanchez for his symptoms of GERD and possible Barrett's esophagus.'").

When an appellant fails to preserve an issue in the district court and fails to make a plain-error argument on appeal, we ordinarily deem the issue waived. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal . . . marks the end of the road for an argument for reversal not first presented to the district court."). Because Mr. Sanchez does not argue for plain error review, we decline to consider the argument.

---

the defendant failed to act in accordance with the standard of care *adhered to by that national board or association*; or . . . [i]f the defendant is not so certified, that the defendant failed to act in accordance with the standard of care *adhered to by health care providers in good standing performing similar health care services.*

Wyo. Stat. Ann. § 1-12-601(a)(i)-(ii) (emphasis added).

15

## ii. *Repeat Endoscopy*

We can easily dispose of Mr. Sanchez's claims regarding Corizon's alleged negligence in failing to order a third endoscopy. According to Dr. Schmitz, the standard of care for patients with persistent GERD symptoms is to refer them "for interval [upper] endoscopy with evaluation of the gastroesophageal junction and biopsy to [rule out] Barrett's esophagus" or the presence of a hiatal or diaphragmatic hernia. Aplt. App., Vol. II at 95. He further opined that Corizon breached the standard of care by "not appropriately evaluating Mr. Sanchez for his symptoms of GERD and possible Barrett's esophagus." *Id.* at 96.

Assuming for purposes of argument that this is the proper standard of care, Mr. Sanchez failed to produce any evidence that the failure to perform an endoscopy between 2010 and 2021, when Dr. Lumb performed the third endoscopy, was the legal cause of his alleged injuries. Mr. Sanchez admitted that he does not have Barrett's esophagus and he produced no evidence that he had either a hiatal or diaphragmatic hernia. In other words, he failed to "offer[] [any] evidence that [Corizon's] alleged breach caused those injuries to go undetected." *Id.*, Vol. III at 159. Thus, we agree with the district court that "[b]ecause [his] case does not fall within the exception to the rule requiring expert testimony and no expert testimony exists supporting [his] claim that [Corizon's] refusal to send him for a repeat endoscopy legally caused the injuries he complains of, summary judgment on this claim is appropriate." *Id.*

16

For the first time on appeal, Mr. Sanchez argues that the legal harm he suffered was "emotional distress and loss of enjoyment of life" between 2013 and 2021, when he was sent for a third endoscopy. Aplt. Opening Br. at 36. Despite the fact Dr. Levene assured him that he did not have Barrett's esophagus, he says he should be compensated for the emotional distress he suffered in worrying about whether the diagnoses from the 2008 and 2010 endoscopies were wrong. As evidence of this injury, he cites his complaint which "alleges economic and non-economic damages, and suffering from past and future emotional distress, as well as past and future loss of enjoyment of life." *Id.*

Setting aside the fact that Mr. Sanchez has waived the argument by failing to raise it in the district court and not arguing for plain error on appeal, *see Richison*, 634 F.3d at 1131, he cannot rely on allegations in the complaint to defeat summary judgment, *see May*, 929 F.3d at 1234.

### iii. *Hernia Surgery*

In 2016, Dr. White diagnosed Mr. Sanchez with a hernia and ordered a hernia belt. But when Mr. Sanchez returned shortly thereafter for further evaluation, he complained that the belt did not reduce the pain. Dr. White determined, however, that the hernia was easily reducible and ordered no further treatment. Mr. Sanchez made no complaints about the hernia until 2018, when he complained of pain. No intervention was taken.

In 2021, Mr. Sanchez complained that he felt burning in the inguinal area when he participated in strenuous activity, but he had not seen a bulge. Dr. Levene

17

examined the inguinal area and concluded that he did not have a hernia.  Dr. Lumb

also performed an examination and could not palpate a hernia.

Nonetheless, Mr. Sanchez alleged that Corizon was negligent in failing to

provide him with the option of a surgical repair for his alleged inguinal hernia.  He

based the claim on Dr. Schmitz's opinion that the standard of care requires that when

an inguinal hernia can be observed or palpated, the patient should be given the option

for surgical repair; he agreed, however, that if on examination he could not feel or

see a bulge in the inguinal area, he "could not diagnose a hernia" and therefore,

"would not recommend surgery."  Aplee. Suppl. App. at 54.  To diagnose a hernia,

Dr Schmitz explained that he would

> be looking for or feeling for a bulge and then, of course, [the patient's]
> history of his injury.  If [the patient] was injured, you know, if he's—you'd
> have to get a good history from him and whether he was active playing
> sports.  Was he injured, kicked?  You know, just you'd have to really talk
> with the patient and get a history, and that would also help make that
> diagnosis.

*Id.* at 52-53.  Dr. Schmitz admitted, however, that he never spoke to or examined

Mr. Sanchez.

The district court granted Corizon's motion for summary judgment on the

grounds that Mr. Sanchez failed to present expert testimony to establish a breach of

the standard of care, causation, or damages.  It also rejected the argument that

Dr. Schmitz was prevented from examining Mr. Sanchez because he never asked the

court "to order . . . such an examination."  Aplt. App., Vol. III at 160.  And on appeal

he presents no legal authority for the proposition that the health service request he

18

filed in February 2021 required Corizon to incur the cost for him to undergo an in-person examination with Dr. Schmitz, his retained expert, without a court order. Thus, summary judgment was proper.

## VI.  CONCLUSION

The judgment of the district court is affirmed; however, we remand to the district court with instructions to modify its dismissal of the deliberate-indifference claims for failure to exhaust administrative remedies to be without prejudice.

We grant, in part, the parties' Stipulated Motion to Seal Volume I of Appellant's Appendix.  According to Mr. Sanchez, "[he] unfortunately used [Corizon's] original Motion for Summary Judgment with unredacted exhibits in Volume I of Appellant's Appendix" instead of a later version that contained redactions of information such as Mr. Sanchez's date of birth.  Stipulated Mot. at 1-2. When Mr. Sanchez discovered this error, he asked Corizon to submit a supplemental appendix that contained its motion for summary judgment with redacted exhibits. "Thus, public access to judicial records will ultimately not be hindered, and [Mr. Sanchez's] private information will be protected." *Id.* at 2.  The problem, however, is that the supplemental appendix does not contain all the documents in Volume I of Appellant's Appendix.  For example, the supplemental appendix does not contain the complaint and answer, which need not be redacted.  Thus, the parties' stipulated

motion is granted, but only to the extent that pages 48 through 245 of Volume I are ordered sealed.

Entered for the Court


Jerome A. Holmes
Chief Judge